## INSURANCE COMPANY *v.* TREFZ.

1. It is not error for the judge, in his instructions, to comment upon the evidence, if he does not take from the jury the right to weigh the evidence and determine the disputed facts.
2. To a question whether he had ever been subject to or affected by certain disorders, including "diseases of the brain," enumerated in an application for an insurance upon his life, which stipulated that the policy should be void in case any statement or declaration in such application was untrue, A., a German, unfamiliar with the English language, — in which the question was put, — answered, "Never sick." In an action on the policy, — *Held*, 1. That the court properly charged that the jury might consider that the answer was made by a man ignorant of the language, who did not on that account understand, and consequently did not intend, its literal scope. 2. That the answer must be taken to mean only that A. had never had any of the enumerated diseases so as to constitute an attack of sickness.
3. Evidence of A.'s admission that he had been sunstruck having been introduced, the court submitted it to the jury to find whether the affection so admitted by him was or was not a case of true sunstroke, and whether the affection which he did have was a disease of the brain. *Held*, that the action of the court was not erroneous.

ERROR to the Circuit Court of the United States for the District of New Jersey.

The facts are stated in the opinion of the court.

*Mr. A. Q. Keasbey* for the plaintiff in error.

*Mr. Joseph Coult, contra.*

MR. JUSTICE MATTHEWS delivered the opinion of the court.

This action was brought by Christina Trefz against the Knickerbocker Life Insurance Company upon two policies of insurance issued to her upon the life of her husband, Christoph Trefz, both dated Sept. 6, 1873, one for $2,500, the other for $8,500. It resulted in a verdict and judgment in her favor. The company sued out this writ of error.

Each of the policies contained the declaration that it was "issued and accepted by the assured upon the following express conditions and agreements," and among others, these: that if the death of the person whose life was thereby insured should be caused by the habitual use of intoxicating drinks, "or if any of the statements or declarations made in or accom-

panying the application for this policy, and upon the faith of which the same is issued, shall be found in any respects untrue, then, and in every such case, this policy shall be null and void."

The company pleaded *non assumpsit*, and specially that the death of the said Christoph Trefz was caused by the habitual use of intoxicating drinks whereby the policy was made void, and issue was taken thereon. No evidence was offered to support the special plea.

It was proved on the trial that on May 25, 1867, a policy had been issued by the defendant in favor of the plaintiff on the life of her husband for $3,000, and another on March 18, 1868, for $10,000, both of which were surrendered on Aug. 30, 1873; on which day two agreements in writing were entered into between the parties, each referring to the number and amount of the corresponding policy, and of one of which the following is a copy : —

"The undersigned, owner of policy No. 16,772 on the life of Christopher Trefz, hereby requests the Knickerbocker Life Insurance Company of New York to issue a new policy for two thousand five hundred dollars, with insurance payable annually, and in consideration thereof I do hereby covenant and agree that all the statements contained in the original application and declaration for the said policy were true and valid when made, and are hereby made the basis of the contract between myself and the said company for the new policy hereby solicited."

The other agreement was in the same form, and asks for a policy of $8,500, and both are signed by Christina and Christoph Trefz.

The application for the original policy for $10,000 was in the English language, the fifth question in which was, —

"Whether now or formerly, when and how long, and to what degree, subject to or at all affected by any of the following diseases and infirmities."

(Here follows a long list, in alphabetical order, of disorders, beginning with "apoplexy" and ending with "yellow fever," and including "diseases of the brain, disease of the heart.")

The answer was, "Never sick."

The application for the original policy for $3,000 was in the German language. It contained a similar question, including diseases of the brain and heart, and to this the answer was "No."

Both of these applications contained this stipulation: "That if any fraudulent or untrue allegation, misrepresentation, or concealment as to my health or habits be contained in this proposal, all moneys which shall or may be paid on account of such assurance or dividends due me shall be forfeited to the said company and the policy be void."

One of them is signed Christina Trefz, by Christoph Trefz, and the one in German by Christina Trefz.

It is stated in the bill of exceptions that the defendant offered evidence tending to prove that the answers of Trefz to these interrogatories were, at the time of such applications, untrue; and the evidence itself bearing on that point is set out in full.

It appears therefrom that the intention with which the testimony was offered was to establish the fact that in the year 1866 Trefz had a sunstroke. One of the witnesses called by the defence to this point was named Schimper, who was in Trefz's employ from the summer of 1866 until 1875. He knew nothing personally about it, but testified that he had heard Trefz say that he had had a sunstroke, and that he had known him to wear a cabbage-leaf in his hat to prevent its recurrence; that in March, 1871, the witness having neglected to pay a premium falling due on one of the original policies, being charged as Trefz's book-keeper with the duty of payment, went with Trefz to the office of the company in New York to tender it, where he was required to submit to a medical examination, to enable the company to determine whether it would accept the premium and restore the lapsed policy. The witness further testified as follows: "The doctor asked me whether Mr. Trefz had sunstroke; I said, No. Mr. Trefz said, Yes; he was sunstruck on the farm once; he had a farm, and was at the farm taking in hay, and was sunstruck." In reply to the question, what suggested to the doctor the fact of sunstroke, the witness said: "I asked the same question of the doctor, whether he could see it. He said, 'I could see it by his queer action

with his elbow, and so I could see that the man had something.' That was the doctor's answer since to me; and he asked me whether he had sunstroke, and Mr. Trefz told he was working on the farm once and was overcome by the heat. He said that did not matter; that did not make any difference; he said, have you felt anything since; and he said, No. Was you sick any time, taken sick by the heat again afterwards? No. That is all right. He gave him a certificate." And the premium was paid and the lapsed policy restored.

In another part of his examination the witness, repeating the statement, said that Trefz told the doctor " he had a sunstroke once when he was working on the farm; he was then working, and he fell down and did not know anything about himself any more: that was his talk to the doctor." The witness was then asked to state what Trefz said. He replied, " That is as near as I can give it. Mr. Trefz spoke very bad English; that was the reason the doctor asked me first whether Trefz had sunstroke, because he did not understand him so well; so Trefz told he was overcome by the heat; he said that half English and half German."

The plaintiff, Mrs. Trefz, testified that on the occasion referred to as that of the sunstroke Trefz came home, saying he was overcome by work and the heat. She offered him his dinner, to which he said he did not care for anything to eat. After a while he ate his dinner and went off to his work again the same day, and then for two days he said he did not feel right well; after that he went about his business as usual.

There was some testimony about his going to Sharon Springs that summer, which is entirely consistent with the supposition that he went upon business as much as for his health; and some evidence, not only that he wore cabbage-leaves in his own hat as a protection against heat, but that he insisted that the drivers of his beer wagons (he was a brewer) should do the same for their own protection.

There was evidence also that Trefz frequently spoke of having had a sunstroke, and there was testimony from two or three physicians on the subject of the characteristics and consequences of sunstroke. One of them spoke of it as a brain disease, and said that whether it was a serious or dangerous thing

depended upon the kind of sunstroke, and that there were degrees in its forms, the severer being frequently fatal, and diminishing down to a mere sense of fulness in the head; and that he considered it more an accident than a disease.

The charge of the court, which was at length, is given in the bill of exceptions in full. To specified parts of it exceptions were taken by the company, and they form the basis of the assignment of errors now to be considered.

It is first alleged that the court erred in charging the jury as follows: " In considering whether the reply. ' never sick ' was an untruth of such a character as to avoid the policy, the jury had the right and ought to remember that the applicant was not a native-born citizen, and that he was not very familiar with the language in which the question was put, and did not speak it with any fluency, and it is fair to assume from the testimony that he did not understand it very fully when spoken to him."

This exception may properly be considered in connection with the sixth assignment of error, as follows: —

" That the court, on request, erroneously refused to charge the jury as follows: ' That if the answer of Trefz to any question was untrue in the sense in which such question and answer are commonly understood, the policy is void, even although the answer may have been true in the sense in which he understood the question; ' but on the contrary charged the jury as follows: ' It seems to me that in endeavoring to ascertain the truth or falsity of the answer we ought to look at it in the light of the knowledge and understanding which the individual had in regard to the terms he uses.' ".

It is objected that the court erred in mistaking the answers referred to, as made by the husband, instead of the wife, who was in fact the applicant, whose answers they were, and that there was no proof that she was not a native citizen, and fully acquainted with the English language.

It is perhaps a palliation of this error, if it be one, that the counsel who makes the objection himself fell into it, in the very request which the court refused, and which speaks of the answer as that of the husband. And practically it was, and was so considered and treated by all parties to the insurance.

The applicant, it is true, was the wife, and it is her agreement that the answers shall be true ; but it is manifest that the party interrogated, and whose answers are relied on, are those of the person whose life is the subject of the insurance.

Indeed, the original applications themselves speak of the allegations, misrepresentations, or concealments, if any, contained in the proposal, the existence of which will avoid the policy, as pertaining to " my health or habits," as though the person whose life was the subject of the insurance was himself the applicant.

The whole trial proceeded upon the idea that the question at issue was the truthfulness of the husband's answers, and upon that ground the company gave evidence of his statements made at other times and places to contradict him.

It is insisted, however, in argument, that there is substantial error in the above charges and refusal to charge, reversing the rule of interpreting contracts according to the ordinary sense of the language employed, and subverting the principle, for which *Ætna Life Insurance Co.* v. *France* (91 U. S. 510) and *Jeffries* v. *Life Insurance Company* (22 Wall. 47) are authorities that in such a case as the present the right of the plaintiff to recover is defeated, upon proof that an answer to any of the questions in the application is untrue, without regard to the materiality of the question or the good faith of the answer. It is unquestionable law, that in such a case as the present the answer must be true, to justify a recovery, without regard to these considerations ; and for a lack of substantial truth, it is no valid excuse that the party giving the answers did not understand, from ignorance or otherwise, the scope of the question. And so, in the present case, the court below distinctly charged the jury. The language used was, " But if you believe from the testimony that the insured, whether wilfully or otherwise, made a statement in his application which amounted to an untruth, it will not do to refuse to enforce the contract which the husband and wife entered into, on the ground that it would be a hardship to the widow." And in another part of the charge the court said, " If they are in any respect untrue, they avoid the contract and prevent a recovery upon the policies."

The question, then, for the jury was this : Was the answer of Trefz to the question whether he had ever had any of the enumerated diseases — "never sick" — true or untrue ? And undoubtedly it was material and even necessary to inquire what was the meaning of that answer. And to ascertain its meaning, — the meaning the law will affix to it, — it is perfectly proper to determine the sense in which the words were used by the speaker; the sense in which he intended they should be understood by the person spoken to, and in which they were actually understood by both. As was well said by Mr. Justice Swayne, in *Insurance Company* v. *Gridley* (100 U. S. 614), "The object of all symbols is to convey the meaning of those who use them, and when that can be ascertained it is conclusive."

The nature of this written instrument, as affected by its form, must be considered in every question of its interpretation. It is not a formal instrument, employing technical language with well-ascertained legal effect, like a deed or a bill of lading, or framed with precision and nicety as to the choice of phrases to express a certain and definite covenant which the parties, duly advised, have entered into with deliberation and in solemn form. It is, on the contrary, a conversation reduced to writing, and the writing done by one only of the parties. The language is colloquial, and in the form of a dialogue; of question and answer. It is in the shape of a deposition, where the party interrogated is giving his testimony, and where the meaning of his statements must be ascertained from his own peculiar use of language. If he is a foreigner, with an imperfect knowledge of the language, it is obviously just and reasonable that that circumstance should be considered in determining the meaning of the words he has used.

In the present instance, the apparent purpose of the charge asked by the counsel for the defendant below and refused by the court, was to charge as a matter of law that the answer of Trefz — never sick — was to be taken as meaning — as it literally does, standing by itself — that he had never during his life had any sickness whatever, and thence to draw the necessary inference that it was untrue in that sense, as it no doubt was, and that, for that reason, the plaintiff's recovery was made legally impossible.

. In that view it became the duty of the court to say to the jury, that in determining whether that statement was true or untrue, in view of the terms of the policy, they might properly consider that it was the expression of a man ignorant of the language, who did not on that account understand, and consequently did not intend, the literal scope of the expression. And whatever sense the jury, as reasonable men, in the light of that circumstance, would put upon it, might well be taken as the sense in which it was understood by the company, to whose agent it was personally spoken, for that would be the sense in which it would be understood commonly by reasonable men in similar circumstances.

Indeed, the court might well have gone further, for it is matter of law that the answer " never sick," in the connection in which it was used in the application, must be taken to mean, not that the party was never sick at all of any disorder, but only that he never had had any of the enumerated diseases so as to constitute an attack of sickness. The generality of the language of the answer must be restrained to the particulars to which alone it was meant to be applied, and the surplusage does not fall within the agreement which warrants the answer to be true.

It is next assigned for error that the court erred in charging the jury in reference to the testimony relating to the transaction with the company's physician, in March, 1871, as to the renewal of one of the policies, as follows: " When this testimony was given, I presume that every gentleman upon the jury at once came to the conclusion that if it was true, and if the agent of the company regarded the attack when he was told of it as of too little consequence to hinder the renewal of the forfeited policies, it was now too late for them to come forward and say that it was of so serious a character and nature that he ought never to have been insured at all ; in other words, that the company ought not to be allowed to regard the indisposition of such a trivial character as to overlook it and take the money of the insured for a renewal of the policies, and after his death to avoid the payment of the loss on the ground that the attack was serious enough to bring it within the range of the diseases respecting which the insured gave the reply ' never sick.' " .

This charge was given in connection with a statement of the testimony of Schimper as to the conversation that took place with Dr. Derby, the medical examiner of the company, in March, 1871, at the time of the examination of Trefz for the restoration of his lapsed policy.

It is not objected to this charge that it instructed the jury as a matter of law that the company was estopped by the restoration of that policy, after the information it had then acquired respecting Trefz having had a sunstroke, from making its defence on that ground to the present action. It is not claimed that that is the meaning of the charge, or that it was so understood by the jury.

It is criticised, however, for inaccuracy in referring to the renewal of the forfeited policies as if both had lapsed, instead of but one, as the fact was; but that inaccuracy could not have misled the jury, as there was no question about the fact; and, so far as the charge had any bearing upon the question at issue, its effect would not be different whether one or both policies had lapsed and had been restored.

The charge in question was merely a suggestion addressed to the jury, perfectly legitimate in itself, but which they might adopt or reject as they saw fit. The court expressly disclaimed any right to influence them as to any matter of fact, and instructed the jury accordingly.

It is argued that the charge assumes from the testimony that the sunstroke spoken of occurred before the date of the original policies, when in the conversation with Dr. Derby, no date being given, he might well have inferred that it was subsequent to that date. But it is entirely immaterial, for however it may weaken the force of the suggestion-upon the question of fact, it does not show that it contained any error in law. The force of the suggestion was to be judged by the jury upon their own finding as to the facts.

It is next assigned for error that the court gave to the jury the following charge: " It is for you to determine the extent of the injury received by Mr. Trefz, and whether it was of such a character or nature as to make his reply to the interrogatories a falsehood or not. It is for the jury to say from the evidence, in regard to the extent, nature, and kind of sickness,

whether the attack which the insured suffered from was of a character to make his answer ' never sick ' a falsehood. The burden of proof is on the defendant. The company sets up the defence, and the jury must be satisfied from the evidence that the untruth of the statement has been established, otherwise their verdict should be for the plaintiff."

This is to be considered in connection with the refusal of the court to give the following charge, which is also assigned for error : " That if within one or two years the insured had such disease (sunstroke), his answer ' never sick ' was untrue, although he had entirely recovered from it long before his death or even at the time of his application ; " and also in connection with the refusal to charge the following, also assigned for error: " That it is proved by witnesses unimpeached and uncontradicted, that the insured frequently stated that he had had sunstroke in the summer of 1866, and guarded carefully against its recurrence long after the insurance was effected ; and that, unless you can find something in the case which renders these statements incredible, the jury are bound to treat the facts as established in the cause, and to find for the defendants on the principle asserted by the court."

The propositions included in these requests, and maintained on behalf of the plaintiff in error, may be stated thus : If Trefz frequently said that he had had sunstroke, it is to be taken as the fact, although the jury might be satisfied from the evidence that what he supposed to be such was not so in reality ; and that if he had ever had sunstroke, his answer to the interrogatory is untrue, although the list of diseases therein enumerated does not contain that of sunstroke, and although it does not appear that whatever affection in fact he had was one of the diseases enumerated. In other words, that it is matter of law that if Trefz said he had sunstroke, that he did have it ; and that it is matter of law that sunstroke, of whatever character or degree in fact, is a disease of the brain, that being the disease in respect to which it is claimed the answer was untrue.

On the other hand, the proposition of the court, as submitted to the jury, was that they must determine from the whole evidence as matters of fact whether or not Trefz ever had had

sunstroke properly so called; and whether the attack which he did have, whether it could properly be called sunstroke or not, was a disease of the brain.

It is not difficult to decide that in this respect the court below committed no error.

The interrogatory propounded in the application, to which the answer in question was made, did not include sunstroke in the list of enumerated diseases. It did include diseases of the brain. The answer, it is conceded, was not untrue, unless Trefz had had a disease of the brain. To establish this it was necessary to prove something more than that he had what he called sunstroke. It was essential to show that he had sunstroke in fact, and that it was such as to constitute disease of the brain.

The medical authority cited in argument by the counsel for the plaintiff in error, Dr. H. C. Wood, Jr. (Thermic Fever or Sunstroke, Boylston Prize Essay, p. 7), shows that what is popularly called sunstroke is not always the true disease known to the profession as such. He says:—

"There can be no doubt that under the name of sunstroke, or *coup de soleil*, sudden cases of severe illness of very different natures have been described by authors. Such of these cases as have really been dependent upon exposure to excessive heat can be classified under two, or perhaps three heads, to which the names of *acute meningitis* or *phrenitis*, *heat exhaustion*, and *thermic fever* or *true sunstroke* may be respectively applied, as more or less expressive of the pathological conditions existing.

"Acute meningitis or phrenitis, due to exposure to the sun and the direct action of its rays upon the head, must be a very rare affection. In fact, I have no positive evidence to offer of its existence in nature, having never seen or read an unequivocal record of such a case, and, therefore, will pass this theoretical class by without further allusion.

"Simple exhaustion due to excessive labor in a heated atmosphere is an affection so very distinct from true sunstroke that it is strange it should ever have been confounded with the latter. It does not differ in its pathology or symptoms from other forms of acute exhaustion, offering like them, as its chief features, a cool, moist skin, and a rapid, feeble pulse,

associated with great muscular weakness and a tendency to syncope. . . .

"As there is nothing peculiar in these cases, I do not think that they should have any special name. The term 'heat-exhaustion' might be applied to them had it not been used to signify true sunstroke. The main point to be borne in mind is, however, that such cases should not be called sunstroke, as they have not the slightest affinity with that disorder."

From this authority, then, it sufficiently appears that a man working in the heat of summer in a hay-field, exposed to the rays of the sun, may be overcome by the heat to the point of exhaustion, so as to be prostrated with weakness, and even fall into insensibility and unconsciousness, without having sunstroke in its technical sense. And thus that it might well be that Trefz, notwithstanding his attack of what he ignorantly called sunstroke, might truthfully answer that he had never been sick of any disease of the brain.

It was undoubtedly, therefore, the principal question for the jury, in order to find whether Trefz's answer that he had never been sick of brain disease was true or untrue, to ascertain and determine whether the affection which he declared he at one time had was or was not a case of true sunstroke, and whether, if so, it was a disease of the brain. That question was fairly submitted to them by the court upon the charges which we have reviewed, and for the reasons assigned we find no error in them.

*Judgment affirmed.*