## MUTUAL BEN. LIFE INS. CO. v. ROBISON.

(Circuit Court of Appeals, Eighth Circuit. November 13, 1893.)

### No. 314.

1. LIFE INSURANCE—APPLICATION—WARRANTY—POWERS OF AGENTS.
   The usual clause in applications for life insurance, to the effect that the applicant warrants his answers to be true, does not operate as a limitation or restriction upon the powers of the insurance company's agents. Their powers remain the same whether the application contains a warranty or only representations.

2. SAME—ESTOPPEL OF INSURER TO DISPUTE TRUTH OF ANSWER.
   When an applicant for life insurance, in answer to a question, states the facts fully and truthfully, and the agent of the company, authorized to ask the question and write the answer, putting his own construction on such facts, deduces therefrom an erroneous answer, which he writes down, assuring the applicant that it is the proper answer upon the facts stated, and the one the insurer wants, the insured is not precluded by his warranty in the application from showing the facts and circumstances under which the answer was made, and when so shown the insurer is estopped from questioning the truth of the answer. 54 Fed. 580, affirmed.

3. SAME.
   The same rule obtains where the applicant answers fully and truthfully, and the agent of the insurer, charged with the duty of asking the questions and writing the answers, abbreviates an answer, or omits part of it.

4. SAME—CONDITIONS IN POLICY—POWERS OF AGENTS.
   A provision in a life insurance policy withholding from the agents authority "to make, alter, or discharge this or any other contract in relation to the matter of this insurance" does not limit the powers of the insurer's agents in preparing and accepting an application for insurance.

5. WITNESS—PRIVILEGED COMMUNICATION—FOLLOWING STATE LAW.
   Code Iowa, § 3643, prohibiting physicians and others from testifying as to confidential communications made to them in a professional capacity, is binding upon a federal court sitting within that state, under Rev. St. U. S. § 858, which makes the laws of the state in which the court is held

rules of decision as to the competency of witnesses in the courts of the United States.

6. DEPOSITION—PLACE WHERE WITNESS "LIVES."
      Under Rev. St. U. S. § 863, authorizing the taking of a deposition "when the witness lives a greater distance from the place of trial than 100 miles," a witness "lives" where he can be found, and is sojourning, residing, or abiding for his health, or any other lawful purpose.

7. EVIDENCE—JUDICIAL NOTICE—GEOGRAPHICAL FACTS.
      A United States circuit court in Iowa may take judicial notice that Asheville, N. C., is distant more than 100 miles from Dubuque, Iowa.

Appeal from the Circuit Court of the United States for the Northern District of Iowa.

In Equity. Suit by the Mutual Benefit Life Insurance Company against Charles W. Robison to cancel insurance policies. Bill dismissed. 54 Fed. 580. Complainant appeals. Affirmed.

Francis B. Daniels, for appellant.
Nathan E. Utt, (Utt Bros. & Michel, on the brief,) for appellee.

Before CALDWELL and SANBORN, Circuit Judges.

CALDWELL, Circuit Judge. This is a suit in equity commenced on the 23d of June, 1891, in the United States circuit court for the northern district of Iowa, by the appellant, the Mutual Benefit Life Insurance Company, hereafter called the "Company," against Charles W. Robison, the appellee, to cancel four policies of insurance on the life of the appellee of $5,000 each, issued by the company to him March 17, 1890. The circuit court dismissed the bill for want of equity. The opinion of Judge Woolson is reported in 54 Fed. 580.

The application for the insurance was taken in Dubuque, Iowa, where the assured then resided, by the agents of the company in that state. The application consists of four parts: First, the application to be signed by the applicant for insurance; second, questions to be asked by the agent and answered by the applicant; third, questions to be asked by the medical examiner of the company and answered by the applicant, the answers to be written by the examiner; fourth, questions asked the examiner, to be answered by him. A clause of the application expressly provides that the answer to the question which the medical examiner is to ask "must be written by one of the company's examiners," who is instructed to "see that the answers are free from ambiguity, and that diseases are distinguished from mere symptoms;" and referring to a long list of diseases, among which is "spitting of blood," he is directed to "ask concerning each and give particulars under head of remarks." The application signed by the assured contains this provision: "I agree that the answers given herewith to the questions of the agent and examiner, which I declare and warrant to be true, shall be the basis of my contract with the company;" and the policies contained this clause: "This policy does not take effect until the first premium shall have been actually paid, nor are agents authorized to make, alter, or discharge this or any other

contract in relation to the matter of this insurance, or to waive any forfeiture hereof. * * *"

For about three years before the assured was examined, the local agent of the company, Charles J. Brayton, had been soliciting him to take out a policy in the appellant company. The assured finally consented to take out a policy for $5,000, and by direction of the agent went to the office of Dr. G. M. Staples, the medical examiner of the company, to be examined. There he met Brayton, the local agent, T. F. McAvoy, the state agent, and Dr. G. M. Staples, the medical examiner, of the company. It is conceded that these gentlemen were the agents of the company, and there is nothing to show that they were not clothed with all the powers and authority which ordinarily pertain to insurance agents in their respective positions. Dr. Staples had been the medical examiner of the company at Dubuque for 25 years. He had also been the family physician of the assured for many years, and had known him from childhood.

The ground set up in the original bill for a cancellation of the policies was that the answer to the fifteenth question asked by the medical examiner was "untrue, false, and fraudulent." An amended bill was filed, alleging that the answer to the eleventh question asked by the medical examiner was false and fraudulent. That question was: "(a) For what have you sought medical advice during the past seven years? (b) Dates? (c) Duration? (d) Physicians consulted?" The answer to this question, as written by the medical examiner, was: "(a) Debility from overwork. (b) Feb., 1888. (c) 10 days. (d) G. M. Staples." The answer to this question, as given by the applicant, included the name of Dr. M. H. Waples as one of the physicians he had consulted. The fifteenth question was, "Have you ever had any of the following?" Here follow the names of 40 diseases, and among them "spitting of blood." To this question the applicant made this answer to the examiner:

"On October 17, 1887, when starting for my office, Dr. S. H. Guilbert, who was attending my wife in her approaching confinement, gave me directions that he would telephone me as soon as I was needed, and to hurry home, bringing with me a prescription of chloroform. I went to my office, buying the chloroform on the way. A little after 2 o'clock, the telephone came for [me] to come instantly. I went to the horse stall in the rear of my office, where I generally kept my horse, and found that some one was using it. I next hurried to the corner of Jones and Main streets, hoping to catch a street car, and thereby reach my home quickly. I was then living at 1468 Main street. Not finding a street car in sight, my only recourse was to get home as quickly as my legs would carry me; and I started up Main street, running for a square or two at a time, and then resting by walking for another square, and kept up that pace, coming up Main street on the west side of the street. Between Tenth and Eleventh, on Main street, I crossed the street by running, and about 50 feet from the corner of Eleventh I jumped across the curbstone. As I did so, I tripped on the curb, and fell. I had hardly picked myself up, and started again, when I noticed that I had expectorated a mouthful of blood. As this was the first time I had ever expectorated blood without knowing where it came from, I was very much shocked, and frightened beyond measure. I turned, and ran as fast as I could to the nearest doctor's office, which was Dr. Waples, a square down, and on the opposite side. I went in, found him there, and begged him to

tell me what was the matter. He said that I was very much excited; to sit down and try and compose myself; that the blood, probably, did not amount to much. He gave me a drink of water, and tried to soothe my agitation as much as possible. After staying there a short time, and finding that the bloody expectoration had stopped, I started to go home. * * * After narrating what I have just stated to Dr. Staples, in his office, on the 19th of October, 1887, he began an examination of my throat and lungs. He made what appeared to me a careful examination of my throat and lungs. He said he saw in my throat a dilapidated blood vessel, that looked as if it had bled away. I asked him if, in his opinion, there was any question but that this blood came from this blood vessel in my throat. He assured me that it did not amount to anything, and to go on about my business; that he had similar cases in his office every day,—of perfectly healthy men expectorating blood from their throat."

The applicant having made this answer, Dr. Staples, the medical examiner of the company, himself testifies that:

"I recollect that I told him that the question, 'spitting of blood,' had a definite significance; that it meant hemorrhage from the lungs or bronchial tubes; and that the spitting of blood, as described by him and as known by me, because I was consulted by him, was manifestly not hemorrhage. I explained to him that this question, 'spitting of blood,' was, in my judgment, as medical examiner of the company, it was put there for the purpose of determining whether there was any evidence of consumption; that the question could not be answered categorically. If you meant spitting of blood from the mouth, probably no person living but what has spit some blood on some occasion, when a tooth has been extracted, or after having the nosebleed. Spitting of blood did not mean that. It meant as evidence of haemoptysis, or diseases of the pulmonary organs. I said that it was not necessary for him to state that he had had spitting of blood; that the question did not imply the spitting of blood, as he had reported it."

And the examiner thereupon directed his son, who was acting as his amanuensis, the examiner himself having pen paralysis, to write the word "No" as the answer to this question, assuring the applicant that that was the proper answer to be drawn from the facts which he had narrated, and which were known to the examiner himself to be true. The applicant at the same time narrated to the local and the state agents of the company all the facts connected with the incident of spitting of blood, as he had stated them to the medical examiner, and asked them if the answer which the examiner had directed him to make to this question was the proper one, and they assured him that it was. The assured, the medical examiner, and the two agents of the company are agreed in their testimony as to what took place. In answer to the question whether he examined the applicant's lungs at the time he examined him for insurance, Dr. Staples says:

"I did as thoroughly as possible; stripping him, and examining him by ear and by use of the stethoscope. I had been Mr. Robison's physician, and had examined him from time to time for various little troubles; and, when I came to examine him for life insurance, I made a most thorough examination of him. I made a more thorough examination of him than of any one. I took three days to satisfy myself about the case, and I positively believe there was no disease of the lungs, and I wanted to satisfy myself whether there was. After making this examination, I came to the conclusion that, so far as his lungs were concerned, they were sound."

So well satisfied were the agents of the company that the assured was a good risk that they pressed the examiner to report

him as a preferred risk, which, however, he declined to do; and they persuaded the assured to increase the insurance from $5,000, as originally contemplated, to $20,000.

The assured stated to the examiner and to the agents of the company every fact and circumstance connected with his spitting of blood. He concealed nothing. He added nothing. And the categorical answer to the question which was written down by the examiner was dictated by him, and approved by the two agents. There was no fraud on the part of any one connected with the transaction. The assured, the medical examiner, and the two agents were all acting honestly and in good faith, and the charge in the bill to the contrary is wholly unsupported by the evidence. But it is said, conceding this to be so, that the answer to the question was in fact untrue, and that the assured had no right to rely upon the assurance of the medical examiner and agents of the company that the answer written down by the examiner was a truthful and proper answer, upon the facts narrated by the assured. To support the contention that, upon the facts stated by the assured, the answer to the question was false, the company introduced as a witness its medical director, who testifies that the term "spitting of blood," as contained in the application, "means ejection of blood from the mouth, without reference to the cause or source." But the medical examiner of the company, who examined the applicant and dictated the answer to this question, gives a different definition to the term. Dr. Staples says:

"The phrase 'spitting of blood' is, and has been for many years, come to be regarded as synonymous of 'haemoptysis,' which term is applied to the raising of blood from the lungs,—that is, the bronchial tubes, lungs, or membrane of the lungs,—and not when it comes from any other source."

And, when asked the meaning of the term as used in the application for insurance in this case, he answered:

"Blood coming from the lungs or bronchial tubes."

In Quain's Dictionary of Medicine, the term is thus defined:

"Spitting of Blood. A proper synonym of 'haemoptysis.' See 'haemoptysis.'" "Haemoptysis. Spitting of blood, having its source in pulmonary or bronchial hemorrhage. The restriction of the term 'haemoptysis,' as thus defined, has the sanction of long usage and convenience."

In the Century Dictionary the definition is:

"Spitting of Blood. Same as 'hemoptysis,' which see." "Hemopses. Hemoptysis. In pathol., spitting of blood, usually restricted to raising blood from the lungs."

And see Singleton v. Insurance Co., 66 Mo. 63.

It will be observed that the medical director and the medical examiner of the company differ as to the meaning of the term. It is not necessary for the court to determine which one of these agents of the company gives the right definition, or whether either is right. The fact that they differ shows that the term is ambiguous. It was the medical examiner's duty to ask this question and write down the answer. For this purpose he was the

agent of the company, and whatever he said or did in the discharge of this duty was the act of the company. In view of his instructions and the ambiguous character of the question, he was clearly acting within the line of his authority when he assumed to interpret and explain to the applicant the meaning of the question, and to interpret and dictate his answer thereto. His special knowledge of medicine and diseases qualified him to do this. The applicant could not have written the answer to the question, if he had desired to do so. Under the instructions of the company, the answer had to be written by the medical examiner. Upon these facts, the act of the medical examiner was the act of the company, and the answer to this question which he dictated and wrote down must be treated as the answer of the company. The answer which the medical examiner deduced from the facts stated by the applicant was probably the right one; but, assuming that it was not, and that he ought to have written "Yes" instead of "No," the fact remains that it was the answer of the company, and the company is estopped to question the truth of its own answers, notwithstanding the application warrants the answer to be true. The usual clause in an application for insurance to the effect that the applicant warrants his answers to be true does not operate as a limitation or restriction upon the powers of the company's agent. The difference between a warranty and a representation is that a warranty must be literally true, without regard to its materiality to the risk, while a representation must be true only so far as the representation is material to the risk. But this difference does not affect the powers of the company's agents. They remain the same whether the application contains a warranty or only representations; and when the assured, in answer to a question, states the facts fully and truthfully, and the agent of the company, authorized to ask the question and write the answer, putting his own construction upon such facts, deduces therefrom an erroneous answer, which he writes down, assuring the applicant that it is the proper answer upon the facts stated, and the one the company wants, the assured is not estopped by his warranty from showing these facts, and when they are proved they operate to estop the company from questioning the truth of the answer. The same rule obtains where the applicant answers fully and truthfully, and the agent charged with the duty of asking the question and writing down the answer abbreviates the answer or omits part of it, as happened in this case to the answer to the eleventh question. All of the agents agree that in answer to this question the applicant stated distinctly that he had consulted Dr. M. H. Waples and Dr. G. M. Staples. Any other rule would result in holding the applicant responsible for mistakes, oversights, blunders, or omissions of the company's own agent, who was, in the case at bar, indisputably, the full and complete representative of the company in all that was said or done in the medical examination of the applicant.

The application contains no limitation of the powers of the agents or the medical examiner. Their powers were coextensive with the business intrusted to them respectively. The clause in

the policy withholding from the agents authority "to make, alter, or discharge this or any other contract in relation to the matter of this insurance" is not a limitation of the powers of the agents in preparing and accepting the application for insurance. This provision of the policy does not take effect until the application is made and accepted, and the policy is issued. It has relation to the policy and other completed contracts concerning the insurance, and has no reference to the application, which precedes the policy, and which, until it is accepted and the policy issued, is a mere offer or proposition for a contract of insurance. Crouse v. Insurance Co., (Mich.) 44 N. W. 497; Kausal v. Association, 31 Minn. 17, 16 N. W. 430.

It is conceded that a breach of a warranty of the truth of the applicant's answer avoids the policy, without reference to the good faith of the applicant or the materiality of the answer. But it is a grave mistake to suppose that this rule can be extended so as to hold the applicant responsible for the truth of an answer which was the result of a mistake in judgment or an error or blunder of the company's agent, who was specially charged by the company with the preparation of the application, and who himself dictated the answers upon a full and truthful statement of the facts by the applicant. In such a case there is no difference between a warranty and a representation. Whether it is the one or the other, the company is estopped to take advantage of its own wrong or mistake, as the case may be. Intolerable injustice and wrong would result from any other rule. This case will serve to illustrate how extremely unjust and oppressive the rule contended for by the company would be. Its position is that "spitting of blood," in the language of its medical director, means "ejection of blood from the mouth, without reference to cause or source," and that, inasmuch as the assured did once spit blood from his mouth, his answer to the question should have been in the affirmative, and, that not being so, there is a breach of the warranty of the truth of the answer, and the policy is void, notwithstanding the medical examiner, whose duty it was to make the examination and write down the answers, assured the applicant, upon a full statement of all the facts, that he had not had "spitting of blood," in the sense of these words as used in the application, and directed the applicant to answer the question in the negative. If this is a sound position, it is equally true that if the applicant had, upon this same statement of the facts, by direction of the company's medical director, answered the question in the affirmative, the company could have claimed the answer was not a true answer, within the meaning of the question in the application, and proved its claim by calling its medical examiner, who has testified that the applicant never had "spitting of blood," in the sense of these words as used in the application, and that there was therefore a breach of the warranty of the truth of the answer, which avoided the policy. Such unreasonable claims and contentions are answered by the familiar and fundamental rule of the law of agency, that the principal is bound by the acts of his agent, in all matters within the

apparent scope of his agency, as fully and completely as if the act had been performed by the principal himself, and that in such cases the principal is as effectually estopped by the act of his agent as if he had performed it himself. The sound rule in this class of cases is clearly and forcibly stated in the case of Insurance Co. v. Olmstead, 21 Mich. 251. Judge Cooley, in delivering the opinion of the court in that case, said:

"It cannot be tolerated that one party shall draft the contract for the other, and receive the consideration, and then repudiate the obligation on the ground that he had induced the other party to sign an untrue representation, which was, by the very terms of the contract, to render it void. * * * When an agent, who at the time and place is the sole representative of the principal, assumes to know what his principal requires, and, after being furnished with all the facts, drafts a paper which he declares to be satisfactory, induces the other party to sign it, and receives the premium, and delivers the contract, which the other party is led to believe, and has a right to believe, gives him the indemnity for which he pays his money, we do not think the insurer can be heard in repudiation of the indemnity on the ground of his agent's carelessness, unskillfulness, or fraud."

We content ourselves with citing a few of the many well-considered cases which fully sustain the doctrine of this opinion: Insurance Co. v. Chamberlain, 132 U. S. 304, 10 Sup. Ct. 87; Insurance Co. v. Wilkinson, 13 Wall. 222; Insurance Co. v. Trefz, 104 U. S. 197; Insurance Co. v. Mahone, 21 Wall. 152; Insurance Co. v. Baker, 94 U. S. 610; Eames v. Insurance Co., Id. 621; Grattan v. Insurance Co., 80 N. Y. 281, 92 N. Y. 274; Flynn v. Insurance Co., 78 N. Y. 568; Pudritzky v. Lodge, 76 Mich. 428, 43 N. W. 373; Insurance Co. v. Hazlewood, 75 Tex. 338, 12 S. W. 621; Insurance Co. v. Snowden, 58 Fed. 342; Sawyer v. Insurance Co., 42 Fed. 30. In many of these cases there were warranties. There is nothing in the case of Insurance Co. v. Fletcher, 117 U. S. 519, 6 Sup. Ct. 837, contrary to the views we have expressed, or that qualifies the doctrine of the cases we have cited. In that case the powers of the agent were limited. The application provided that:

"No statements or representations made, or information given, to the persons soliciting or taking the application for the policy, should be binding on the company, or in any manner affect its rights, unless they were reduced to writing, and presented to the home office, in the application."

And this limitation was brought to the notice of the assured at the time the application was made. So far from overruling, the court reaffirms, the rule firmly established by its previous decisions, and says:

"Where such agents, not limited in their authority, prepare applications and take down answers, they will be deemed as acting for the companies. In such cases it may well be held that the description of the risk, though nominally proceeding from the insured, should be regarded as the act of the company."

Dr. Waples, who was consulted by the assured at the time he spit blood, was called as a witness by the company, and asked to describe the spitting of blood, and explain the nature of it. The defendant objected to the question upon the ground that the information sought was privileged, the witness being the physician of

the defendant at the time. The court sustained the objection, and this ruling is assigned for error.

Section 3643 of the Code of Iowa reads as follows:

"No practicing attorney, counselor, physician, surgeon, minister of the gospel, or priest of any denomination, shall be allowed in giving testimony to disclose any confidential communication, properly entrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office according to the usual course of practice or discipline. Such prohibition shall not apply to a case where the party in whose favor the same are made waives the rights conferred."

Section 858 of the Revised Statutes of the United States provides:

"In the courts of the United States no witness shall be excluded in any action on account of color, or in any civil action because he is a party to or interested in the issue tried: provided, that in actions by or against executors, administrators, or guardians, in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other, as to any transaction with, or statement by, the testator, intestate, or ward, unless called to testify thereto by the opposite party, or required to testify thereto by the court. In all other respects, the laws of the state in which the court is held shall be the rules of decision as to the competency of witnesses in the courts of the United States in trials at common law, and in equity and admiralty."

Construing this section, the supreme court of the United States, in Potter v. Bank, 102 U. S. 163, said: "The existing statute (Rev. St. § 858) seems too plain to require construction," and after pointing out that "the first clause of that section shows that there was in the mind of congress two classes of witnesses" that should never be excluded from testifying, added: "In all other respects, that is, in all cases not provided for by the statutes of the United States, the laws of the state in which the federal court sits constitute rules of decision as to the competency of witnesses in all actions at common law, in equity, or in admiralty."

The precise question we are considering was before that court in the case of Connecticut Mut. Life Ins. Co. v. Union Trust Co., 112 U. S. 250, 5 Sup. Ct. 119. The case was tried in New York, which state has a statute similar to the Iowa statute which we have quoted. The court said:

"Since it is for the state to determine the rules of evidence to be observed in the courts of her own creation, the only question is whether the circuit court of the United States is required by the statutes governing its proceedings to enforce the foregoing provision of the New York Code. This question must be answered in the affirmative."

And, after referring to the state and federal statutes on the subject, the court said:

"For these reasons, it is clear that the circuit court properly refused to admit physicians called as witnesses to disclose information acquired by them while in professional attendance upon the insured, and which was necessary to enable them to act in that capacity."

These cases contain the last, and therefore the authoritative, expression of the opinion of the supreme court on this question, and are controlling in this court. If the case of Insurance Co. v. Schaefer, 94 U. S. 457, on this point, conflicts with the later cases in that court, then, to that extent, it must be regarded as having been

overruled. In the case of Liggett v. Glenn, 2 C. C. A. 286, 51 Fed. 381, this court referred to the rule announced in Insurance Co. v. Schaffer, supra. The later decisions of that court were not called to our attention, and not considered, and, as stated in the opinion, the correctness of the ruling of the trial court was "not dependent upon the question whether the state statute is applicable or not."

The overruling of a motion to suppress the deposition of the defendant was also assigned for error. The deposition was taken under section 863 of the Revised Statutes of the United States, which authorizes a deposition to be taken "when the witness lives a greater distance from the place of trial than one hundred miles." The ground of the motion was that there was nothing in the deposition showing that the witness lived at a greater distance from the place of trial than 100 miles. The place of trial was Dubuque, Iowa, and the deposition was taken at Asheville, N. C. The court will take judicial notice that the distance between these places is more than 100 miles. For the purpose of taking a deposition under this statute, a witness "lives" where he can be found, and is sojourning, residing, or abiding for any lawful purpose. The witness in this case had gone to Asheville for his health. The duration of his stay there was uncertain.' It was not probable that he would return to his former place of residence, or come within the jurisdiction of the court, in time to take his deposition, and therefore the taking of it at Asheville was an eminently prudent and proper act. The company attended and cross-examined, and this was a ·waiver of all irregularities in the notice of taking the deposition. Railroad Co. v. Stoner, 2 C. C. A. 437, 51 Fed. 649.

The decree of the circuit court dismissing the bill for want of equity is affirmed.