# HOWGATE v. THE UNITED STATES.

CRIMINAL LAW; FORGERY; VIOLATION OF SEC 5421, R. S. U. S.;
INDICTMENT; FALSIFICATION OF GOVERNMENT ACCOUNTS;
PLEADING; VARIANCE; STATUTE OF LIMITATIONS;
FUGITIVE FROM JUSTICE; EVIDENCE;
PRACTICE; INSTRUCTIONS AND
CHARGE TO JURY.

1. The insertion of a false item in a blank receipt for money, used as a voucher in a disbursing officer's accounts, certified by him to be correct, with intent to defraud the United States, is a criminal offence under Secs. 5418, 5421 and 5479, R. S. U. S., whether forgery at common law or not.

2. Where one indictment charges a disbursing officer with such an offence, and another with the transmission of his accounts so falsified to the Treasury Department with his certificate of their correctness, it is immaterial that the second indictment does not in terms charge him with knowledge of their falsity, especially where criminal knowledge of the falsity of the certificate is alleged; *construing* Sec. 5421, R. S. U. S.

3. Examinations of jurors on their *voir dire* is largely a matter resting in the sound discretion of the trial court, which will not be revised on appeal except for manifest error injurious to appellant.

4. Where an indictment against a government disbursing officer for the falsification of his accounts charges that a false item in a voucher was written *above* his signature, and the proof shows that the item was written first and the signature afterwards, there is no material variance.

5. In criminal law it is not generally necessary to prove time precisely as stated; and an allegation of time is not material where the offence has otherwise been sufficiently alleged.

6. It is not a variance in contemplation of law where upon or with a paper for the falsification of which an indictment is found, there appears another writing, a certificate, separate and independent, although connected with the falsified writing, which certificate is genuine.

7. A person under arrest and in custody who has escaped from custody, whether against the will or with the connivance of his keepers, and who has thereby become a fugitive from justice and gone out of the jurisdiction of the court to which he was amenable, is not entitled upon being brought back, to have the benefit of the statute of limitations that would have accrued in the meantime to bar his prosecution; *construing* Secs. 1043, 1044 and 1045, R. S U. S.

8. A person who, while under indictment, escapes from his proper custodians and succeeds thereafter for years to elude capture, will be conclusively presumed to be a fugitive from justice; and if he leaves the jurisdiction his intention in so doing is not open to controversy.

9. The expression "fleeing from justice" in Sec. 1045, R. S. U. S., relating to the limitation of criminal prosecutions, is not restricted to cases in which indictments have been actually found; so that if a person under indictment for one crime, but guilty of several, flees from the jurisdiction, the statute will not constitute a bar to prosecution for such other crimes after three years without indictment found.

10. Where in the trial of a prisoner under indictment for crimes fifteen years old, the prosecution to show that the prisoner was during that time a fugitive from justice, adduces testimony showing the details of his escape and recapture, it is not error for the trial court to exclude testimony offered by the defence in alleged rebuttal of the presumption of guilt, to show that the prisoner was seen at various times and his whereabouts known by officers of the Government.

11. Immaterial testimony adduced on behalf of the prosecution, cannot be met by immaterial testimony on behalf of the defence.

12. It is not error for a trial court to refuse to duplicate or reiterate instructions to the jury.

13. A party cannot properly object to a portion of a charge to the jury which follows and is the equivalent of an instruction asked by him and granted.

14. When a trial court has once fully, fairly and correctly stated the
    law to the jury, it is not bound to repeat the same instruction
    under the different phases of language that may suggest them-
    selves to counsel.

No. 497.   Submitted October 16, 1895.   Decided November 14, 1895.

HEARING on an appeal by a defendant indicted and con-
victed of forgery and uttering forged paper and for viola-
tion of Sec. 5421, R. S. U. S.   *Affirmed.*

The COURT in its opinion stated the case as follows :

The appellant, Henry W. Howgate, was indicted on April
1, 1895, in two several indictments, the one for forgery and
the uttering of a forged paper, and the other for transmit-
ting to an officer of the Treasury Department a certain
false or forged certificate with intent to defraud the United
States, in violation of the provisions of section 5421 of the
Revised Statutes of the United States.   All the offences
were alleged in the indictments to have been committed in
the months of October and November of the year 1879 and
April of the year 1880, that is, about 15 years before the
finding of the indictments.   To each of the two indictments,
which were afterwards consolidated for the convenience of
trial, the defendant pleaded not guilty.   At the trial he was
found guilty by the jury on both indictments ; and on July
2, 1895, after a motion in arrest of judgment had been over-
ruled, he was sentenced to a term of 4 years in the peniten-
tiary for each offence, being 8 years in all.

It appears from the record that from July 25, 1876, to
September 1, 1880, the appellant Howgate, who was at the
time an officer in the military service of the United States
with the rank of lieutenant, was detailed to a branch of that
service known as the Signal Service, and was employed
therein as "property and disbursing officer ;" and that, as
such "property and disbursing officer," it was his duty faith-
fully to disburse the money appropriated by Congress for
the support and maintenance of the Signal Service.   Its dis-

bursements appear to have amounted to about $35,000 a
month.    It seems that the money payable under the appro-
priations was placed in a gross sum to the credit of the ap-
pellant, after a requisition made therefor by the Secretary
of War upon the Secretary of the Treasury ; and was kept
by him on deposit in his own name, partly with the Treas-
urer of the United States in Washington, and partly with
the Assistant Treasurer in New York.    The money thus
deposited was subject at all times to the appellant's check, and
was drawn by him when and as he thought proper, without
supervision from anyone.    For each month, however, it was
his duty to render to the Third Auditor of the Treasury,
the officer charged by law with the auditing of the accounts
of the War Department, an account of his receipts and dis-
bursements.    This account consisted of three principal
papers ; namely, an account current, and two abstracts.    In
the account current appeared a statement in detail of all
sums received by the officer and chargeable to him, the total
payments made by him on account of each appropriation
during the month for which the account was rendered, and
the balance with which he was chargeable at the end of that
month on account of each appropriation.    The first abstract,
which is designated in the record as Abstract A, contained
a summary of each voucher representing property purchased
during the month ; and the other abstract, which is desig-
nated in the record as Abstract B, contained a summary of
payments made during the month for services rendered.
These services rendered consisted in great part of the trans-
mission of telegraphic messages from many different places
in the United States ; and a very large part of the sums ex-
pended was paid for such telegraphic service.    Owing, it is
said, to the unavoidable delays in the collection of these
messages, bills for such services were not generally rendered
until the lapse of some time after the end of the months to
which they severally appertained and during which the ser-
vices were rendered ; and the work of auditing the bills in
the telegraphic division of the Signal· Service occupied so

much time that the disbursing officer's accounts were usually not rendered to the Treasury Department until about four months after the month to which they appertained. Vouchers were taken in duplicate, upon forms provided by the office, one being sent to the Third Auditor, and the other being retained by the disbursing officer for his own use.

As already stated, the appellant, Howgate, was relieved from duty in the Signal Service on September 1, 1880; and soon afterwards, on December 7, 1880, he resigned his office of first lieutenant in the army. Suspicions of grave irregularity having arisen concerning his management of the funds of the Signal Service, an indictment was found against him on October 21, 1881, for embezzlement of those funds; and he was arrested, and on the next day (October 22, 1881), he was committed to jail. Several other indictments soon followed, some of them for embezzlement and some for forgery, and one of them with not less than seventy different counts for as many different sums of money alleged to have been converted by the defendant to his own use in fraud of the United States. The first count of the first indictment, that of October 21, 1881, charged the embezzlement by him of the same sum of $4,000, in connection with which the forgery is alleged, which is the subject of the first indictment now before us.

On April 13, 1882, there was an order made by one of the justices at the time of the Supreme Court of the District of Columbia, presumably holding the criminal court term of that tribunal, by which the appellant was permitted, under a suitable guard, to visit his residence in the city of Washington, "for the purpose of examination of papers, &c., not to remain, however, longer than two hours." In pursuance of this order, he went to his residence in charge of one of the deputies of the United States Marshal for the District of Columbia, and while there, he made his escape and fled from the District. Ineffectual efforts were made by the marshal and by the police of the District of Columbia to rearrest him. It was not until September 27, 1894,

that he was again arrested in the city of New York, where, under the name of H. Williams, he was engaged in business as a dealer in second-hand books and periodicals, and was brought back to the District of Columbia.

He was in due time put upon trial under some of the old indictments, and was acquitted. Thereupon, on April 1, 1895, two new indictments were found by the grand jury. In the first count of the first of these two indictments, the appellant was charged with the making of a false or forged account against the United States, written in a voucher for $4,000, returned to the Third Auditor of the Treasury, with the account of the appellant for the month of November, 1879; and in the second count of the same indictment, he was charged with uttering and publishing the said forged paper as true. The second indictment charged him, under section 5421 of the Revised Statutes of the United States, with transmitting and causing to be transmitted to the Third Auditor of the Treasury, in support of his account current for the month of November, 1879, a false certificate, with knowledge of its falsehood.

So far as was disclosed by the evidence in behalf of the prosecution, the transaction on which the indictments were founded was this. In the early part of the year 1879, a corporation was organized in the State of New York for telegraphing purposes under the name of " The American Union Telegraph Company," with D. H. Bates as president. This company contracted with an organization within itself, designated as a construction company, for the erection by the latter of telegraph lines for the use of the principal company. This work of construction was just started about the month of October, 1879. On October 12, 1879, the appellant wrote to Bates to ascertain whether any of the construction stock of the American Union Telegraph Company could be had, and at what figure. Bates answered to the effect that shares of the stock to the nominal value of $5,000 had been allotted to the appellant and an equal amount to General Myer, Chief of the Signal Service. Under date of October 27, 1879, the ap-

pellant again wrote to Bates, inclosing his check for $4,000 on the Assistant Treasurer of the United States in New York, drawn against the money of the United States under his charge for the use of the Signal Service, which sum he requested Bates to apply to the payment of the two lots of stock for $5,000 each, both of which he asked to be put in his own name, inasmuch as General Myer, according to the statement of the appellant, would not take any in his own name directly.   He also requested that vouchers should be signed by Bates, or by the treasurer of his company, for the receipt of the money ; and blank vouchers, such as were used in the Signal Office, were inclosed by him for that purpose with the check or draft for $4,000.   These vouchers for some reason were returned by Bates unsigned, but with a memorandum receipt of the treasurer of his company for the $4,000.   Thereupon the appellant again wrote to Bates the following letter :

" MY DEAR SIR : The treasurer's memorandum receipts for subscription to stock came to hand and are satisfactory and necessary for proper handling of stock, but our official regulations require that regular vouchers should be made for all disbursements, and I therefore return the vouchers for either the signature of yourself or the treasurer as before stated.  Please return them to me at your earliest convenience in order that I may make my proper return.

"Very respectfully,

. "(Signed)      H. W. HOWGATE,

"*P. & D. O., Signal Service.*

" P. S.—In returning them leave the body of the voucher blank in order that it may be filled according to regulations.

"(Signed)      H. W. H."

In response to this letter, Bates filled out the blank receipt at the foot of the voucher, signed it as the president of the American Union Telegraph Company, and returned it to the appellant, that part of the paper being left blank wherein the account should appear for which the money was paid.   Five months later, on April 9, 1880, this paper

so signed by Bates was transmitted by the appellant to the
Third Auditor of the Treasury as a voucher under Abstract
B of his account for November, 1879, the abstract setting
forth that it was dated on November 11, 1879, and was for a
payment made to the American Union Telegraph Company,
at Washington, the sum being charged to the appropriation
for " Observation and Report of Storms." The voucher
then appeared with the blank space filled in so as to read:
" For reports in arbitrary cipher, equivalent to 133,334 nu-
merical words over one circuit, at 3 cents per word." As
completed it was as follows:

*Fund O. R. S.    Appropriation '79 and '80.*
(Form 10.—Expenditures).
The United States to the American Union Telegraph Co., Dr.

| 1879. | | Dollars. | Cents. |
|---|---|---|---|
| November.. | For reports in arbitrary cipher, equiv-<br>alent to 133,334 numerical words<br>over one circuit, at 3 cents per<br>word . . . . . . . . . . | 4,000 | |
| | | 4,000 | |

Approved.
A. J. MYER,
*Brig. Gen'l (B'v't Ass'g'd),*
*Chief Signal Officer, U. S. A.*

I certify that the above account is correct.
H. W. HOWGATE,
*1st Lieut., P. & D. Officer, Sgnal Service, U. S. A.*
Received at Washington, D. C., the 11 of November,
1879, of First Lieutenant H. W. Howgate, P. & D. officer,
Signal Service, U. S. Army, the sum of four thousand
dollars and — cents in full of the above account.
(Sign here.)        THE AMERICAN UNION TEL. CO.,
(In duplicate.)                By D. H. BATES, *Pres't.*

The account current, with which this voucher was transmitted, and into the figures of which the sum of $4,000 therein mentioned was carried, had appended to it the following certificate in the usual form used in the office :

" I certify that the above is a true account of all the moneys that have come into my hands on account of the Signal Service, United States Army, during the month of November, 1879, and that the disbursements have been faithfully made. The balance due the United States is in currency and is deposited.

" (Signed)    H. W. HOWGATE,

"*1st Lieut., P. and D. Officer, Signal*

"*Service, U. S. Army.*"

No services whatever had been rendered by the American Union Telegraph Company to the United States. That company at the time had no telegraph lines, and was not in any manner engaged in commercial work. The statement in the voucher was false, and was made to conceal the appropriation of the sum of $4,000 to the purchase of so-called " construction stock," as already stated, by the appellant, for his own use and benefit.

At the trial these facts were shown on behalf of the prosecution, and they were scarcely controverted by the defence. The prosecution also adduced proof tending to show that the defendant was a fugitive from justice, and therefore not entitled to the benefit of the statute of limitations in criminal cases, which provides that " no person shall be prosecuted, tried or punished for any offence not capital,   *   *   *   unless the indictment is found or the information is instituted within three years next after such offence shall have been committed."

The testimony on behalf of the defence was mainly directed, or rather was intended—for most of it was in fact excluded by the court—to show that the appellant, during the years of his absence from the District of Columbia, had been seen in various places in the United States, even by persons in the official and military service of the United

States ; that once even during that time he had been in Washington ; and that he had made no pretense of disguise or concealment.  This testimony was offered to controvert the claim of the prosecution that the appellant had fled from justice.   There was also testimony on both sides to show the routine of business in the Signal Service Office ; and some on behalf of the defence intended to shield the appellant by showing that the forgery for which he was indicted might in fact have been committed by others.

The appellant, as already .stated, was convicted of the offences with which he was charged ; and from the judgment against him he has prosecuted the present appeal.

*Mr. A. S. Worthington* and *Mr. J. M. Wilson* for the appellant :

1. The very essence of the crime of forgery is the making of a paper which purports to be the act of another and which is not, in fact, his act.   This may be done either by forging the signature, by altering the paper over the signature, or by inserting something in the paper not authorized by the signer.   In other words, the act to constitute an offence known to the criminal law must be *to the prejudice* of another.   A paper which has no signature could prejudice .nobody, for by itself it is evidence of nothing.   That a mere memorandum like the account described in this indictment could not, in a legal sense, prejudice the United States is manifest.

There have been many attempts to define the crime of forgery.   Perhaps Mr. Bishop's is the most accurate.   He says, " Forgery is a fraudulent making of a false writing which, if genuine, would be apparently of some legal efficacy."   2 Bish. Cr. Law, sec. 523.   He illustrates in the same chapter what is meant by " legal efficacy " by reference to many decided cases.   Sec. 533–547.   Many other cases as to what instruments are the subjects of forgery are collected in a note in 22 Am. Dec. 306–315, and the later

cases will be found in 8 Am. St. 469, 470. *State* v. *Briggs,* 34 Vt. 501. A consideration of these references will demonstrate that a writing can not be a forgery in a legal sense unless it purports on its face to bind somebody to something—unless it be signed—the sole exception being when it is made, under some circumstances, in books of account.

Even where there is a signature, if it be imitated so clumsily that no one could be deceived by it, it is no forgery. *State* v. *Warren,* 109 Mo., and cases cited therein; 22 Am. Dec. 321—note to *Arnold* v. *Cost.*

2. Our two leading writers upon the subject of criminal law concur in saying that the statute of limitations in criminal cases is to receive a highly liberal construction in favor of the defendant—that the courts will lean more to the side of defendant in criminal than in civil cases. Bish. St. Cr. 259; Wharton Cr. Pl. & Pr. 316.

The same doctrine is announced by Wood in his work on Limitations, page 33. He quotes a strong case on this subject in New Jersey—*Moore* v. *State,* N. J. L. 384. To the same effect is *People* v. *Lord,* 12 Hun, 287. We have not been able to find in text books or reports any contrary doctrine suggested.

That at this day statutes of limitations are no longer to be grudgingly administered, but are to be broadly and favorably interpreted to sustain the end they have in view—that of preventing courts from being involved in inquiries as to questions of fact after the lapse of time has rendered a satisfactory investigation impossible—will not be questioned in this jurisdiction. The Supreme Court of the United States has repeatedly so held. *Bell* v. *Morrison,* 1 Pet. 351; *Shepherd* v. *Thompson,* 122 U. S. 231; *Bauserman* v. *Blunt,* 147 U. S. 657.

Nor can any question be made that in this jurisdiction in civil cases the rule that the statute of limitations, once started, runs on in spite of disabilities that afterward occur, is in force. Angell on Limitations, sec. 196; Wood on

Limitations, pp. 7, 8, 10; *Ruff's Admr.* v. *Bull*, 7 H. & J. 16; *Maurice* v. *Worden*, 52 Md. 295; *State* v. *Henderson*, 54 Md. 345; *McDonald* v. *Hovey*, 110 U. S. 619; *De Arnaud* v. *United States*, 151 U. S. 483.

We have not been able to find any reported case either in the Federal or in the State courts in which it has been suggested that the rule here invoked does not apply to criminal as well as to civil cases. Bishop lays down the rule as applicable in criminal cases, but the authorities which he cites are all civil cases. Bish. St. Cr. 361 (*a*).

There seems to be no doubt that when one who has committed an offence successfully conceals his connection with the crime so that a prosecution is impossible, the statute runs in his favor if he does not flee. Bish. St. Cr. sec. 261 (*c.*); *United States* v. *Maillard*, 1 Ben. 459; *Com.* v. *Sheriff*, 3 Brews. 394; *United States* v. *White*, 5 Cranch C. Ct. 44, 78; *State* v. *Nute*, 63 N. H. 79.

Even if the statute does stop running when the accused flees from justice, no warrant is to be found in its terms for saying that it shall not go on again when he ceases to be a fugitive.

*Mr. A. A. Birney*, U. S. Attorney for the District of Columbia, and *Mr. Wm. Meyer Lewin*, Special Assistant Attorney, for the United States:

1. The indictment is based upon a statute, and the account described as falsely made is a writing within the meaning of that statute. The statute (sec. 5418) does not confine its penalty to writings which were subjects of forgery at common law; " other writings " in the statute means any false writing of any character made with the purpose to defraud the United States. *United States* v. *Lawrence*, 13 Blatchf. 211; *United States* v. *Houghton*, 14 Fed. R. 544; *United States* v. *Staats*, 8 How. 41.

If the account *by itself* was harmless and could not defraud, extrinsic circumstances alleged in an indictment (as

here) may make an otherwise harmless paper a forgery. *People* v. *Shall*, 9 Cowen, 778 ; *State* v. *Wheeler*, 19 Minn. 98 ; *United States* v. *Lawrence*, 13 Blatchf. 215 ; *Com.* v. *Castles*, 9 Gray, 123 ; *Dand* v. *State*, 31 S. W. Rep. 376 (Texas).

Forgery at the common law was the false making of *any written instrument for the purpose of fraud or deceit.* 2 East Crown Law, 852 ; *Rex* v. *Ward*, 2 Ld. Raymond, 1461 ; 2 Russ. on Crimes, 767, 768, 774 ; 4 Blackstone Com. 247 ; 1 Whart. Cr. Law, sec. 653 ; *Arnold* v. *Cost*, 3 Gill & J. 220 ; *Benson* v. *McMahon*, 127 U. S. 457, 468.

The making of false accounts has frequently been held forgery, although no signatures were involved. 2 Russ. on Crimes (9th ed.), 775, 776 ; *Luttrell* v. *State*, 85 Tenn. 234 ; 2 Bish. Cr. L., sec. 586.

2. The statute of limitations is an act of grace, and only those persons who come within its terms can claim its benefits. Persons who flee from justice are expressly excluded. The statute being plain the court will give effect to all its terms. Judicial construction may not construe away a plain statute. Endlich on Statutes, sec. 337 ; *United States* v. *Hartwell*, 6 Wall. 396.

Section 1044 is to have no application to any person fleeing from justice. There is no exception in favor of those fugitives who may cease their flight and openly expose themselves to arrest in another jurisdiction, or of those who, having fled from justice, return to the locality of the crime. By their voluntary flight such persons forfeit the grace extended by the statute, and this forfeiture the courts may not condone by importing equitable or merciful considerations into the statute by construction only. "Where a statute makes no exceptions, the courts can make none." Endlich on St., secs. 17, 18, 23 ; *Amy* v. *Watertown*, 130 U. S. 327 ; *Com.* v. *Kimball*, 24 Pick. 370 ; *Pittsburg* v. *Klackthaler*, 114 Pa. St. 547 ; *McIver* v. *Ragan*, 2 Wheat. 25.

No sound argument can be drawn from supposed analogies to the statute in civil causes. The statutes are essen-

tially different in form and in substance.    The civil statute must always be pleaded ; but time is so far of the substance of criminal offences that limitations need not be pleaded, and without such plea the State must show the offence to have occurred within the statutory period.    *United States* v. *Cook*, 17 Wall. 168.    Again, the replication of fraudulent concealment is good in civil actions, but is not receivable in criminal prosecutions.    Whart. Cr. Pl. and Pr. 327.

If the defendant, having committed a crime in this jurisdiction, when wanted by the officers of the law therefor was found without this jurisdiction, he was a fugitive from justice within the meaning of this law.    *Roberts* v. *Reilly*, 116 U. S. 80, 97.

Mr. Justice MORRIS delivered the opinion of the Court :

Fifty-two assignments of error are stated, and these assignments are based upon upwards of sixty exceptions taken on behalf of the appellant during the course of the trial.    The questions of law, however, raised by these exceptions, are no more than three or four in number, and it is therefore unnecessary to notice the assignments in detail.

1. The first question that is made is as to the sufficiency of the indictments as stating a cause of action against the appellant.    This question is raised by a motion in arrest of judgment, and by three prayers (numbered 1, 2 and 3) for instructions to the jury requested on behalf of the appellant and refused by the court, and whereby it was sought to direct the jury peremptorily to render a verdict for the defendant.

The charge of the first count of the first indictment is, in substance, that, in a paper purporting to be an account, certified by him over his genuine signature to be a correct account, and with a genuine receipt attached to it for the actual sum of money therein specified, signed by the person who had actually received the money, the appellant inserted, or caused to be inserted, in a blank space left for its

D. C.]                    Opinion of the Court.

insertion, an item of account, the sole item of account therein contained, which was wholly false and fictitious and which purported to be for services that had never in fact been rendered, with intent thereby to gain a credit for himself from the United States and to defraud the United States out of the specified sum of money.    It is elaborately and ably argued, on behalf of the appellant, that, while the act so charged may have been a criminal act, the crime of forgery, as known at the common law, could not be predicated of it, and that an indictment for forgery in that behalf cannot be sustained.

We do not deem it necessary to follow counsel in this line of argument, nor to determine whether at the common law the paper in question could have been the subject of forgery.    It is sufficient for us to know that by the statute law of the United States the act charged against the appellant in this first count of the first indictment is branded as a criminal act ; and that, if the indictment charges the offence in the words of the statute, and is not otherwise insufficient or defective, we need not inquire whether the indictment would have been sufficient at the common law.

By three several acts of Congress has the making of false papers for the purpose of defrauding the United States been made a criminal offence punishable by fine and imprisonment.    First, by the act March 3, 1823 (3 Stat. 771) it was enacted, " that, if any person or persons shall falsely make, alter, forge, or counterfeit, or cause or procure to be falsely made, altered, forged, or counterfeited ; or willingly aid or assist in the false making, altering, forging, or counterfeiting any deed, power of attorney, order, certificate, receipt, or other writing, for the purpose of obtaining or receiving, or enabling any other person or persons, either directly or indirectly, to obtain or receive, from the United States, or any of their officers or agents, any sum or sums of money ; or shall utter or publish as true, or cause to be uttered or published as true, any such false, forged, altered, or counterfeited deed, power of attorney, order, certificate, receipt, or

other writing, as aforesaid, with intent to defraud the United
States, knowing the same to be false, altered, forged, or
counterfeited; or shall transmit to, or present at, or cause
or procure to be transmitted to or presented at, any office
or officer of the Government of the United States, any deed,
power of attorney, order, certificate, receipt, or other writing,
in support of, or in relation to any account or claim, with
intent to defraud the United States, knowing the same to be
false, altered, forged, or counterfeited, every such person shall
be deemed and adjudged guilty of felony; and being thereof
duly convicted, shall be sentenced to be imprisoned and
kept at hard labor for a period not less than one year, nor
more than ten years; or shall be imprisoned not exceeding
five years, and fined not exceeding $1,000."

This act was carried into the Revised Statutes as·section
5421. An act of April 5, 1866 (14 Stat. 12), almost in the
precise words of the act of 1823, provided that the false
making, forging, altering, or counterfeiting of "any bond,
bid, proposal, guarantee, security, official bond, public rec-
ord, affidavit, or other writing, for the purpose of defraud-
ing the United States, as well as the utterance or trans-
mittance thereof to any officer of the Untted States with
fraudulent purpose, should be deemed a felony and punished
by fine and imprisonment. And this has been carried into
the Revised Statutes as section 5418.

Again, in the act of Congress of June 8, 1872 (17 Stat.,
pp. 283, 321), with special reference, it would seem, to the
Post Office Department, inasmuch as the act is entitled "An
act to revise, consolidate, and amend the statutes relating
to the Post Office Department," the provisions of the act of
April 5, 1866, were re-enacted as section 294 of this act;
and section 5479 of the Revised Statutes appears to have
been taken from this section.

By a comparison of these several enactments, it will be
seen that, while section 5421 of the Revised Statutes, which
is taken from the act of 1823, purports in terms to forbid
the falsification of "Any deed, power of attorney, order, cer-

tificate, receipt, or other writing," and while sections 5418 and 5479, which embody the later enactments, specify "bonds, bids, proposals, guarantees, securities, official bonds, public records, affidavits, or other writings," it is the plain intention and express purpose of all of them to brand as criminal the falsification of any and all writings, usual in the transaction of the business of the United States, or used in the dealings of those who have business with the United States, when such falsification is made for the purpose of defrauding the United States. We are not to assume that, because certain classes of writings are specified, we are to regard as surplusage and attach no meaning to the expression " other writings." Certainly the falsification of a payroll, or of an account current, or of a voucher, can be as great a fraud upon the United States as a fictitious bid, or a forged affidavit. The language of the statute is broad enough to include all writings whatever of every kind and character, by which the United States could be defrauded ; and there would seem to be neither reason nor propriety in giving it any restricted meaning that would destroy its efficacy, when its plain purpose is to prevent fraud upon the United States by the falsification of papers.

· In the case of the *United States* v. *Lawrence*, 13 Blatchford, 211, it was said : "·Nothing in the language used, nor in the mischiefs intended to be remedied, nor in the circumstances under which the statute was enacted, indicates that the words ' other writings ' were.used in a restricted sense, but the contrary. Various writings are mentioned, but these writings have no common object, nor any characteristic features common to all from which to infer an intention to restrict the effect of the provision to any particular class of writings."

This was held in a suit under one of the statutes that have been cited ; and it seems to us that the ruling was reasonable and proper. A similar ruling was made in the case of the *United States* v. *Houghton*, 14 Fed. Rep. 544. And the decision of the Supreme Court of the United States,

under the act of 1823, appears to us to be conclusive of the matter. In the case of *United States* v. *Staats*, 8 How. 41, that court said :

" A genuine instrument containing a false statement of fact used in support of a claim, the party knowing it to be false, and using it with intent to defraud, presents a case not distinguishable in principle, or in turpitude, or in its mischievous effects, from one in which every part of the instrument is fabricated ; and when the one is as fully within the words of the statute as the other, we may well suppose that it was intended to embrace it."

Both upon reason and upon authority, therefore, we are of opinion that, whether the falsification charged in this indictment be or be not a forgery at the common law in the technical sense of that term, it is a criminal offence under the statute, and inasmuch as the indictment fully and sufficiently charges it in the words of the statute, and sets forth the extraneous circumstances under which, in connection with other papers, an instrument of writing, in and by itself perhaps incapable of accomplishing the fraud sought to be perpetrated, was in fact made the means of effecting that fraud, we must regard the appellant's objection to the first count of the first indictment as not sustained. And if the objection fails as to the first count, it is equally insufficient in its application to the second count of that indictment.

The same reasoning in substance will apply to the appellant's objection to the second indictment, which is found under the same statute not for the falsification of the paper, but for the transmissal to the Treasury Department of the paper so falsified, which transmissal, under the statute, is itself a criminal offence, independent of the offence of falsification.

It is argued here, however, on behalf of the appellant, that it is not sufficiently charged in this second indictment that the appellant knew the instrument to be false when he transmitted it. But this argument is untenable. The indictment, it is true, does not in terms charge that the ap-

pellant transmitted the account current and abstracts to the Treasury Department, well knowing them to be false. But when it has already been specifically charged that he himself, and no other, perpetrated the falsification, it is not apparent how he could otherwise have transmitted them than with knowledge of their falsehood. The statute evidently contemplates not only that parties might transmit to the accounting officers of the United States papers forged or falsified by themselves, but likewise, and perhaps more frequently, that they might so transmit papers forged or falsified by others. And in the latter case it would manifestly be improper to hold the persons transmitting forged papers to criminal liability unless they knew the true character of the writings so transmitted or sought to be used.

But even if it should be assumed that the second indictment is defective because it does not here sufficiently charge knowledge on the part of the appellant, it does certainly and sufficiently charge him with criminal knowledge in the matter of the transmission of the certificate attached to the account current, which became a false and fraudulent paper by its being attached to that account.

We think the court below was right in overruling the appellant's motion in arrest of judgment, and in refusing all the appellant's prayers for instruction based upon the supposed insufficiency of the two indictments or of either of them.

2. Exception was taken on behalf of the appellant to a question propounded by the prosecution to each person called to serve as a juror, when he was interrogated on his *voir dire*. It was known in advance that the application of the statute of limitations would play an important part in the case ; and the district attorney, with the view of ascertaining the bias of the proposed jurors on that subject, if any such bias there was, propounded to each one of them this question, over the objection of the appellant :

" These indictments charge offences committed in 1879, and the indictments were found in the spring of 1895. I

will ask you whether the time which has elapsed between these periods will prevent you from returning a verdict according to the evidence, under the instructions that may be given by the court as to the law relating to the offences charged in those indictments ? "

This question was answered in the negative by each juror, and it does not appear from the record that any person was excluded from the jury box by reason of a different answer.

These exceptions, although not abandoned, are not greatly insisted on by counsel for the appellant. We must regard them as untenable. Examination of jurors on their *voir dire* is largely a matter resting in the sound discretion of the trial court; and that discretion ought not to be revised by an appellate tribunal, unless for manifest and palpable error injurious to the appellant. *Reynolds* v. *United States*, 98 U. S. 145. Much latitude should be allowed in the examination of jurors as to their opinions formed from rumor or reading; and the discretion of the court in restricting or enlarging the scope of such examination should not be assigned as reversible error, unless it is made very plainly to appear that the rights of the appellant were thereby prejudiced. We fail to see how the appellant's rights were prejudiced in the present instance by the district attorney's inquiry. The question could not be held more prejudicial than, in cases of trials for capital offences, an inquiry as to a juror's views on the subject of capital punishment, the propriety of which is beyond controversy.

3. Alleged variances between the allegations of the indictments and the proofs adduced in support of them are made the subjects of three assignments of error, based upon four several prayers for instructions to the jury requested on behalf of the appellant and refused by the court. By three of these prayers, those numbered 16, 17 and 18, the court was asked to say to the jury that, if the appellant's signature to the vouchers was written thereon after the false item had been written into the blank space which had been left for it, there could be no conviction. These

prayers were offered in view of the statements in the indictments that the false item was written *above* the signature and certificate of the appellant, from which it was inferred that the signature of the appellant was stated to have been put to the paper *before* the insertion of the false item. Consequently it was assumed on behalf of the appellant that there could be no conviction, if it appeared that in fact this order of time was reversed in the execution of the paper.

Independently of the contention of the prosecution, which seems to be well founded, that the allegation of the indictment has reference, not to the time, but to the place upon the paper, of the alleged falsification, it seems to us that the position of the appellant in this connection cannot be sustained on any ground. If we assume that there was a variance in this particular between the indictment and the proof, which does not sufficiently appear, it is well settled in the criminal law that it is not necessary to prove time precisely as stated, and that the allegation of time is not material, where the offence has otherwise been sufficiently described and alleged. Of course, there are well known exceptions to this rule; but this case does not fall under any of such exceptions. It would seem to be wholly immaterial in what order as to time the appellant put together, if he did put together, the writings which he is charged with falsifying, and whether he first inserted his signature to the certificate and then the false item in the voucher, or whether he pursued the contrary course. The charge against him is the falsification and use by him, at or about a certain specified time, of certain fraudulent papers, which are identified with the utmost precision, and wherein the false item is specifically and minutely pointed out; and it is of no consequence that, in the fabrication, a different order of time might have been observed than as alleged in the indictment.

It is also objected that there was a variance between the indictment and the proof, because it appeared in evidence that the falsified voucher bore the indorsement upon it of the

approval of Gen. Myer, the chief, at the time, of the Signal
Service.   But we fail to see how it affects this case that
Gen. Myer was misled into giving his approval to a fraud-
ulent paper.   That approval, whether indorsed upon the
same paper or not, was an independent document.   It did
not give validity to the paper by which the fraud was perpe-
trated.   The addition of an authentic document does not
detract from the criminality of an illegal one.   It rather en-
hances that criminality, inasmuch as it diminishes the oppor-
tunity for detection.   Nor can it be a variance in contempla-
tion of law, that, upon or with a paper charged to be false,
there appears another writing, separate and independent,
although perhaps connected with the falsified writing, which
may have been honest and genuine.

We think, therefore, that the twenty-second prayer of the
defendant, which has reference to this special matter, was
properly refused.

It seems proper to remark here, inasmuch as the name
of Gen. Myer has been connected with this transaction, and
as his lips have long since been sealed with the silence of
death, that there is nothing whatever in this record to jus-
tify suspicion of the integrity of that officer, or to show that
he was in any manner connected with the fraud here charged
against the appellant.   The references to him in the corres-
pondence between Bates and the appellant are wholly
gratuitous.   It is true that he endorsed with his approval
the fraudulent voucher which the appellant is charged to
have concocted ; and it is possible that in so doing he may
have been chargeable with negligence.   But it is probable
that the blame should be placed on the routine and methods
of the office, which required the signature of the chief of
the service to so large a number of vouchers, when there
was no adequate opportunity for examination of their cor-
rectness.

4. The most important question in this case, that upon
which most reliance is placed on behalf of the defence, is
that of the application to the case of the statute of limita-

tions.   This, with the testimony that bears upon the question, both that which was admitted and that which was excluded, and the instructions which were granted or refused in connection therewith, it is proper now to consider.

Testimony was adduced by the prosecution substantially to the effect that, while the appellant was in the custody of the United States Marshal for the District of Columbia and awaiting trial under various indictments for the misappropriation of the money of the United States in his hands or under his control, therein including an indictment for the embezzlement of the specific sum with reference to which the false and fraudulent paper in the present indictment is charged to have been made and uttered, he escaped from that custody, fled from the District, and secreted himself from the pursuit of the officers charged with the possession of his person and of the police of the District of Columbia, who strove to discover and rearrest him.   Some testimony was adduced also in regard to the efforts made thereafter by the Department of Justice and the officers of the United States to discover his whereabouts and to recapture him.

No objection was made by the defence to the introduction of any of this testimony; and the fact of the escape of the appellant, which to a certain extent appeared as matter of record and was in fact matter of public notoriety, was not controverted, and could not well have been controverted.   But it was sought to be shown on behalf of the defence, and testimony was offered to that effect, that at different times between the year 1882 and the year 1894, the defendant had been seen publicly and without disguise or concealment, in various parts of the United States, by various persons, some of them in the military service of the United States, and one of them afterwards an Assistant Attorney-General of the United States ; and the inference was sought to be deduced from this that he was not a fugitive from justice, that he could have been had at any time if the authorities had wanted him, or if due diligence had been used for his recapture ; that the authorities in fact did

not want him, and that even his flight in the first instance may have been due to an intimation from his keeper that he should get out of the way.

Upon objection by the prosecution all this testimony was excluded. Thereupon the counsel for the defendant moved to exclude from the consideration of the jury some of the testimony on the same point that had been offered by the prosecution and admitted without objection; and the court, in pursuance of the motion, struck out a considerable part of it. Error, however, is here alleged on the refusal of the court to strike out all that was requested to be stricken out by the defendant's counsel, and also on the refusal of the court to admit the testimony offered on behalf of the appellant, as hereinbefore stated. And error, also, is alleged to have been committed by the trial court in the matter of the instructions granted and refused with reference to the admitted evidence and the conceded facts bearing upon the inquiry as to whether the appellant was a fugitive from justice in the sense of the statute such that he should be denied the benefit of the statute of limitations to which otherwise he would undoubtedly have been entitled.

We must say that any attempt to show that the appellant escaped from custody with the connivance or concurrence of those who were charged with the duty of his safe keeping, and that the failure to recapture him was the result either of negligence or of unwillingness on the part of persons in authority, is wholly immaterial and irrelevant. A man who effects his escape from the custody of the law, under which he is held to await trial in pursuance of an indictment against him, is no less a fugitive from justice, because perchance his keepers or others have negligently or wilfully aided and abetted his escape; nor does a fugitive from justice cease to be a fugitive because he has been seen somewhere in public, or because officers in the service of the Government have conversed with him and have failed to take action to secure his re-arrest. It is natural to sym-

pathize with a fugitive ; and there is often an equally natural reluctance to participate in the detection and arrest of one who has been a companion in arms and an honored associate in other days. But whatever excuse or justification there may be for inaction in such cases, we cannot accede to the conclusion, which the logic of the contention on behalf of the appellant demands from us, that officers of the Government, or even private citizens, by conversing or associating with a fugitive from justice, knowing him to be a fugitive, can thereby secure the condonation of his offence, and operate an estoppel upon the United States against his further prosecution. This would be a most dangerous doctrine to establish. The legal status of a fugitive from justice cannot be changed in that way.

It is true that the offence with which this appellant was charged was an offence against the United States ; that during the whole or the greater part of the time of his absence from the District of Columbia he was still within the territorial limits of the United States ; and that he might have been arrested for the offence anywhere within the United States. But that offence was cognizable only by the courts of the District of Columbia ; the appellant had been arraigned in those courts ; the justice to be meted out to him was to be administered by those courts and by no others ; and when he fled beyond the territorial jurisdiction of those courts, he fled from justice. It is evasion of the authority of the courts of justice that makes a person to be a fugitive from justice.

It is plain, therefore, that the testimony sought to be adduced on behalf of the defendant was immaterial and irrelevant, and could not serve any useful purpose. It could not change the status which the appellant had given to himself by his flight.

But it is to be considered that the appellant did not immediately upon the commission of the alleged offence become a fugitive from justice. He remained in the District of Columbia, a part of the time in custody, for upwards of

two years after the date assigned for the commission of the alleged offence. It is claimed that, with reference to the two indictments now before us, the statute of limitations had commenced to run long before he left the District ; and that having once commenced to run, it should not be held to stop running on account of his departure. It is argued that the statute of limitations in criminal cases should be construed no less liberally towards the accused than the similar statute made for civil cases.

An alternative proposition also is advanced, that if it should be held that the operation of the statute of limitations was suspended or interrupted by the appellant's flight and absence from this jurisdiction, yet by adding the time subsequent to his re-arrest and between that and the date of the finding of these indictments to the time that had elapsed previous to his flight, a period of more than three years had elapsed, and the bar of the statute thereby became complete.

The statute of limitations applicable in the premises is contained in sections 1043, 1044 and 1045 of the Revised Statutes of the United States, which are taken from the 32d section of the act of Congress of April 30, 1790 (1 Stat. 119), slightly modified by the act of April 13, 1876 (19 Stat. 32, 33) ; and is as follows :

" Sec. 1043. No person shall be prosecuted, tried or punished for treason or other capital offence, wilful murder excepted, unless the indictment be found within three years next after such treason or capital offence is done or committed.

Sec. 1044. No person shall be prosecuted, tried or punished for any offence, not capital, except as provided in section 1046, unless the indictment is found, or the information is instituted, within three years next after such offence shall have been committed. But this act shall not have effect to authorize the prosecution, trial or punishment for any offence barred by the provisions of existing laws.

" Sec. 1045. Nothing in the two preceding sections shall extend to any person fleeing from justice."

It is apparent from even the most casual reading of the statute that there is no warrant whatever for the theory of interruption and addition presented as an alternative proposition for the defence.    The law makes no provision for any such interruption or addition ; and the courts have no right to make it.    There is nothing of the kind even in the statute of limitations for civil cases, except in so far as it is specifically provided, or as it is necessitated by the operation of international law, as during the existence of a state of war. And we fail to see any good reason why we should interject such a provision into the statute for criminal cases.    We understand that, in the statute laws of some of the States there are some such provisions ; but nothing of the kind has been thought proper to be incorporated into the legislation of the District of Columbia.

The proposition that the statute having once begun to run did not cease running on account of the flight of the appellant, and that the bar of limitations became absolute after the lapse of three years from and after the date of the commission of the crime, we regard as likewise untenable and unsound.    If the correctness of this proposition were admitted, it would inevitably follow that the proviso of the statute never could have application to any case.    That proviso would be an absolute nullity.    Upon this theory, it would be in the power of any man who has committed a crime to defeat the ends of justice by remaining within the jurisdiction a week, a day, or an hour perhaps, and then by escape and successful concealment to baffle arrest until the statutory period has been completed and the bar of the statute has fully accrued.    It may be that he was not known at the time, or for some time afterwards, as the perpetrator of the offence ; and yet upon this theory the statute would go on to operate none the less, and immunity could be perfected by flight.    The machinery of justice requires a reasonable time for its being put into operation.    Warrants have to be issued ; grand juries have to be convened ; indictments have to be prepared ; all the precautions have to be

observed without which, under our system of jurisprudence, no man can properly be held to answer to a charge of criminal liability.    The law allows three years within which all this shall be done.    But assuredly it does not mean that a criminal may render them all nugatory by fleeing from justice until the supposed bar of the statute shall have accrued. . The statute of limitations in criminal, as well as in civil cases, is a statute of peace and repose ; but it should not be made a shield for crime, instead of serving the beneficial purpose for which it was intended, that of being a safeguard against improper prosecution when perhaps the evidence of innocence has been lost or impaired by the lapse of time.

We must take the statute to mean what its language plainly imports, that a person who flees from justice before its bar takes effect shall have no benefit whatever from it. The proviso of the statute is explicitly to the effect that its remedial provisions shall not extend to persons fleeing from justice.    In spite of this express provision, shall we say that fugitives from justice shall have the benefit of the statute as though they had not fled? It seems to us that the statute is not open to construction of that kind which would virtually nullify it.    It may be that a fugitive by his return, or by his return and surrender, if he has escaped from arrest, may entitle himself thereafter to have the statute again run in his favor ; but this point it is not necessary here to decide.    What we do determine is that a person under arrest and in the custody of the law, who has escaped from that custody, whether against the will or with the connivance of his keepers, who has thereby become a fugitive from justice and gone out of the jurisdiction of the court to which he was amenable, is not entitled, upon being brought back, to have the benefit of the statute of limitations that otherwise would have accrued in the meantime to bar his prosecution.

And we may remark here that the question of intention is not open to consideration at all in this case, as it was in

case of *United States* v. *O'Brien*, 3 Dillon, 381. Whatever may be the latitude of inquiry in the case of one going out of the jurisdiction and not secreting himself while there is no charge pending against him, the law will conclusively presume that one who is under indictment and who effects his escape from those who have been duly charged with his custody, and who succeeds thereafter for years to elude recapture by the officers who had him in custody, is a fugitive from justice ; and the question of his intention in going out of the jurisdiction is not open for controversy. Escape from legal detention necessarily constitutes one a fugitive from justice.

It is suggested that the construction of the law which we have indicated should be given to it leads to the harsh conclusion that a person who has lived in the community unmolested for nearly the period of limitations, and who then flies, under the influence perhaps of some sudden terror, should thereby lose the benefit of all the time that had elapsed, notwithstanding perhaps that he might almost immediately return. When the case of such a person is presented it will probably be time enough to consider it. That is not the case of one who escapes from custody and from pending indictment. But it can be answered also that it is easy to imagine cases of special hardship under any general law. The law is not made for special cases, but for the general regulation of conduct. Moreover, fleeing from justice is itself a wrongful act, although perhaps not always a criminal one ; and we fail to see the harshness of the law which holds a person to the just legal consequences of his own wrongful act. But if there be harshness, it is for the legislative authority, not for the courts, to effect its removal by a modification of the statute.

The further consideration is pressed upon us that by the expression "fleeing from justice," used in the statute, is meant fleeing from pending prosecution, and that for all other crimes committed before the flight, other than those with which the fugitive has been in some manner charged,

the statute of limitations will constitute an absolute bar after the lapse of three years without indictment found. We are unable to see that this proposition has any more force in reason or foundation in the law than the others which have been considered. Its effect, if admitted, would be equally to nullify the statute, which would be meaningless under any such theory. There is no such thing as pending prosecution in the view of this proposition, unless indictment has been found; and if indictment has been found, there is no application for the statute at all. If indictment has been found for one crime, we are wholly unable to see why that should be taken to affect the status of the accused person with reference to another and a different crime.

In the consideration of the questions here involved, we derive but little assistance from adjudicated cases. The cases of the *United States* v. *Brown*, 2 Lowell, 267, and the *United States* v. *John Smith*, 4 Day, 121, are cited in support of the appellant's propositions, and the case of the *United States* v. *White*, 5 Cranch C. C. Rep. 73, in opposition. But in the case of the *United States* v. *Brown*, it does not appear that the defendant was in any proper sense of the term a fugitive from justice. In the case of the *United States* v. *Smith*, the question was as to the right to require a witness to testify who had been an accomplice in the crime, which was engaging in the slave trade, no indictment having been found against the witness, although more than two years, the statutory period at the time, had elapsed since the date of the alleged crime. The witness was called by the prosecuting attorney. He declined to testify on the ground that his answers would tend to criminate him. The prosecution insisted, because he was apparently protected by the statute of limitations from prosecution; and counsel for the defendant objected on the alleged ground that the witness had been a fugitive from justice, and therefore was not protected by the statute. The court held that the witness was *prima facie* pro-

tected from prosecution and should testify. We do not think that this ruling gives any support to the appellant's contention. It does not pass upon the question directly as between the United States and an accused person, but only incidently. It would have been manifestly improper to inject the trial of a witness into the trial then in progress. *Prima facie* the witness was protected by the statute, and entitled to immunity. The suggestion of his having been a fugitive from justice does not seem to have emanated from himself; but from the defendant's counsel. It tended to raise an issue of fact, which, it would seem, the United States only could properly raise, which the United States in this case by necessary implication waived, and which in any event it would have been improper to inject into the case on trial. It seems to us that it was entirely proper in that case to hold that the protection of the statute was applicable to the witness. But the present is a very different case from that. The fact of the appellant's being a fugitive from justice is directly involved in the issue here; and the *prima facie* protection of the statute has been removed by the charge in the indictment and the proof of the fact that the defendant was a fugitive from justice.

Most directly in point is the case of the *United States* v. *White*, 5 Cranch C. C. Rep. 73. There it appeared that the defendant, Richard H. White, and his brother, Henry H. White, had been indicted on March 30, 1836, for setting fire to the United States Treasury Building on March 30, 1833, more than two years, the statutory period at that time, having elapsed since the date of the commission of the crime. Richard H. White, it seems, had left Washington on the evening of the day on which the offence was committed, or on the morning of the following day, and had gone to New York, presumably for the purpose of evading arrest and prosecution. But he afterwards returned to Washington, and was arrested and indicted. The benefit of the statute of limitations was sought on his behalf, and there seems to have been quite an elaborate discussion of the ques-

tion whether, as a fugitive from justice, he was entitled to it. The old Circuit Court of the District of Columbia, which was then in existence, and before which the case was tried, was divided and undecided upon the point. At first, two of the three judges who comprised the court were of opinion that the defendant was entitled to immunity under the statute. But afterwards Chief Justice CRANCH, who was one of the two that constituted the majority in the first instance, changed his views and accepted those of Associate Justice THRUSTON ; and the court finally ruled that the defendant was a person fleeing from justice in the contemplation of the statute, and that, as such, he was not entitled to the benefit of the limitation provided by it.

It may possibly be, as claimed by counsel for the appellant, that the authority of this case is not great, and that the authenticity of the reports in which it is contained is not beyond question, notwithstanding that they have been very generally recognized by the bench and bar of the District of Columbia as entitled to credit and respect. But however this may be, the opinion of Mr. Justice THRUSTON, whose views finally prevailed in the determination of the case, seems to us to have been eminently logical and sound. With him we must say that we cannot see how a person fleeing from justice, and who has by such flight forfeited his right to the benefit of the statute, can rehabilitate himself by his own act in returning to the jurisdiction, or be relieved from the forfeiture by some equitable interpretation of the court in construing the statute in his favor. The defendant cannot undo what he has done ; and the court has no power to relieve him against the express provision of the law.

Without prolonging the discussion, we must conclude that the appellant in this cause is not entitled to the benefit of the statute of limitations, and that the rulings of the court below in that regard were correct.

5. Error is assigned on the action of the court below in reference to the excluded testimony of the appellant upon another ground. It is claimed that it should have been ad-

mitted to rebut the presumption of guilt arising from the appellant's flight. It may be that in cases of departure from the jurisdiction after the commission of some alleged offence, when there has been no arrest and no indictment found, testimony of the character of that here offered on behalf of the defendant may be admitted, although even that seems doubtful. But when an accused person has escaped from custody and from a pending indictment, there is no place for any such testimony. No testimony whatever can avail to rebut the presumption which the law conclusively deduces from the fact of the escape itself.

Nor need we consider the exceptions of the appellant to the refusal of the court below to strike out all the testimony for the prosecution which it was sought to strike out. Without reference to the right of the appellant to have such testimony stricken out after it had been admitted without objection, or to the technical rule of practice that refuses the right of exception to the refusal of a trial court to strike it out, it seems to us that no testimony was retained that was not properly part of the *res gestæ* of the appellant's escape and recapture. Whatever of guilt might be inferred from these *res gestæ*, it would be proper to rebut with any testimony applicable to those *res gestæ* that could be had. But testimony to show that appellant was seen in various places by various persons during the long term of his absence can have no reasonable bearing on the establishment of the question of his guilt or innocence. It is too remote.

Nor is the claim admissible that immaterial testimony adduced on behalf of the prosecution may be met by similar immaterial testimony on behalf of the defence. As we have stated, we do not find that the testimony which was excepted from the defendant's motion for exclusion was at all immaterial or irrelevant. And certainly if it was, the rules of evidence would not thereby be abrogated, and the doors thrown open for the introduction at will of any and all immaterial and irrelevant evidence, however disconnected and remote from the facts sought to be shown by the alleged immaterial evidence of the prosecution.

6. There are some other exceptions to testimony, which are not greatly, if at all, insisted on, and which seem to us to be unimportant, and to require no consideration from us.

7. On behalf of the defence an exception was noted to the refusal of the trial court to give an instruction on behalf of the defendant with respect to the testimony of the witness Bates. The instruction requested, which was the nineteenth in numerical order of the instructions presented on behalf of the defence, was to the effect that, if Bates was found to be an accomplice in the criminal transaction with which the defendant was charged, his testimony should be received with great care and caution. But inasmuch as the twentieth instruction requested on behalf of the defendant was identical in terms and in substance with this nineteenth instruction, with only very slight and unimportant verbal alterations, and was granted and given to the jury, it is not apparent to us what error was committed here. It is well settled law that a court is under no obligation to duplicate or reiterate instructions to a jury—indeed that it is improper to duplicate instructions.

But it is argued further that, in the portion of the general charge wherein the court specifically gave this twentieth instruction to the jury, it was accompanied with an explanation or statement that was erroneous in its assumption of the guilt of the defendant. The explanation was to the effect that, if the jury should find that Bates was an accomplice with the defendant in the perpetration of the fraud upon the United States charged in the indictment, then his testimony should be weighed with great caution. It is argued that this was equivalent to telling the jury that, if they found the defendant guilty and that Bates was an accomplice in his crime, the testimony of Bates should be cautiously received—a total perversion, it is claimed, of the purpose of evidence.

It is not easy, perhaps, in the case of a witness who appears to have been an accomplice with the person on trial for an alleged offence, to frame an instruction that will as-

sume him to have been an accomplice, and yet exclude the assumption of the guilt of the person on trial.     There cannot be an accomplice in guilt unless there has been guilt; and a witness could not have been an accomplice of an accused person unless that person himself was guilty.     To pronounce a witness to be an accomplice, and then to ask that his testimony, as the testimony of an accomplice, should not be greatly regarded, seems to involve a contradiction in terms.     And yet to this criticism the instruction requested by the defendant and given by the court is just as amenable as was the explanation or statement by the court to which exception is taken.     The expression " an accomplice with the defendant," which are the words to which special objection is made, does not differ in substance or legal effect from that used in the defendant's own prayer, " an accomplice in the commission of the offences charged in the indictment ;" for the offences charged in the indictment are offences committed by the defendant.     One assumes the guilt of the defendant as much as the other ; both are but different modes of expressing the same idea.     We do not think that the defendant has any just or legal cause of complaint that instructions asked by himself, or the equivalent of them, have been given to the jury.     While, perhaps, both the instruction and the explanation might have been more guardedly and cautiously worded, we cannot suppose that an intelligent jury was misled by either, or that this was grave error for which the judgment should be reversed.

8.  The last exceptions to be noted are those taken to the action of the court when the jury, after having retired to deliberate upon their verdict, were recalled, upon the intimation that one or more of them required additional instructions.     After they had come into court, one of the jurors asked to be advised whether, if the falsification alleged in the indictment had been done by a subordinate or by some one unknown to the defendant, the law would construe it to be the act of the defendant.     This inquiry the court answered by reading again to the jury two of the instructions

that had been requested by the prosecution and which had already been read to the jury. The substance of these instructions was that, if the defendant wrote or caused to be written the alleged false item of account, or if with his own hand, or with the hand of another, he made the alleged false writing, with intent to defraud the United States, he would be guilty, subject to the limitation that he was not a fugitive from justice. At this point the defence renewed the exception which they had previously taken to the instructions when first given; and they thereupon presented two additional instructions, formulated by themselves, which they requested to be given to the jury upon the special point of inquiry. These proposed instructions were in substance that, if the jury should find that the alleged false words in the voucher had been written by a clerk or agent of the defendant, the writing was not his act, and he was not criminally liable for it, unless it was done by his express direction or with his knowledge. The court refused to consider the instructions, upon the ground, it seems, that at that stage of the cause, the parties were not entitled to ask for additional instructions. Exception was again taken on behalf of the defendant.

The same juror thereupon propounded another question to the court, which was in effect whether, if the jury should find that the defendant did not himself write the false words, or cause them to be written, but that he did sign the certificate that it was a true account, the law should be construed that he might as well have made the entry with his own hand as to have signed that certificate. To this the court replied :

" I inform the jury that it is not always necessary for a forger to write with his own hand the paper charged to be forged. If the defendant did not aid personally in the manual operation, yet if this manual act was done by his procuration, direction, or authority, and with his knowledge, the defendant would be responsible, and would be guilty of the crime of forgery. If he procured by his direction

and with his knowledge the manual act by causing to be written the words here charged to have been forged by another person—if the defendant did this thing in person or by procuration, with intent to defraud the United States—he would be guilty of forgery."

And to this answer exception was also taken on behalf of the defendant.

The questions propounded by the dissatisfied juror were not very clearly framed; they omitted some of the essential elements of the crime; but they appear to contemplate an answer from the court upon a negative aspect of the case. They sought to ascertain whether, if the jury thought that the appellant had neither written the false words himself nor caused them to be written, he could still be held guilty in consequence of his having certified to the correctness of the voucher and of the account. And apart from the question of the right of the defence at that time to present prayers for instructions, it does not appear that the instructions requested might not, perhaps with some qualification, have been given by the court.

But the instructions that were given were proper and a correct statement of the law; and they answered the juror's questions by a statement in the affirmative as to what would constitute guilt on the part of the accused. In these instructions the court told the jury that, if they found that the defendant had made the false writing, or caused it to be made, with intent to defraud the United States, he should be held guilty of forgery. In the instructions that were refused he was asked to say to the jury that, if they found that he had not done this, he was not guilty of the offence with which he was charged. The latter proposition was only the converse or the negative of the other; and the court had already told the jury in the general charge that the defendant must be presumed to be innocent until it was shown beyond reasonable doubt that he was guilty of the offences charged against him, and that he was the person by whom or under whose direction the false

writing was made.    It would not have been error, under the circumstances, to have repeated this statement; but neither can we regard it as error that this was not done. When a trial court has once fully, fairly, and correctly stated the law, it is not bound to repeat the same instruction under the different phases of language that may suggest themselves to the laudable earnestness of counsel in their effort to secure absolute accuracy.    We think that this position is amply supported by authority.    *Mining Co.* v. *Cheesman,* 116 U. S. 529; *Ayers* v. *Watson,* 113 U. S. 594; *Smith* v. *Field,* 105 U. S. 52; *Clymer* v. *Dawkins,* 3 How. 674; *Railroad Co.* v. *Gladmon,* 15 Wall. 401; *Railroad Co.* v. *Whitton,* 13 Wall. 270; *Knickerbocker Ins. Co.* v. *Trefz,* 104 U. S. 197.

After an examination of the record as thorough and conscientious as it has been possible for us to give it, and such as the importance and peculiar circumstances of the case and the novelty of several of the questions involved in it have demanded from us, we are unable to find any error for which the judgment of the court below should be reversed.

We must, therefore, *affirm the judgment, and remand the cause to the Supreme Court of the District of Columbia, with directions to proceed therein according to law.    And it is so ordered.*